[File No. 6953]

## THE STATE OF NORTH DAKOTA, Respondent, v. ALAN COLITON, Appellant.

(17 NW(2d) 546, 156 ALR 1403)

Opinion filed February 8th, 1945

*W. H. Adams,* for appellant.
*O. B. Benson,* for respondent.

BURR, J. The complainant sets forth:

"That near Westhope in Bottineau County, North Dakota, she gave birth to an illegitimate child on the 23rd day of July, 1942, and that the father of said child is Alan Coliton. That the act of intercourse which caused her pregnancy and childbirth occurred at Westhope in Bottineau County, North Dakota on or about October 23, 1941.

"Wherefore, Affiant prays that the said Alan Coliton may be arrest-

ed and declared to be the father of said child and liable for its support and care.

"Affiant further states that for a period of more than four years prior to the birth of her child she was and still is married but was not living with or cohabiting with her husband during any of that time."

The defendant demurred, alleging:

" . . . that it (the complaint) does not state that the child therein alleged to have been born to the complaining witness, Myrtle Rosendahl, was born out of wedlock, but, on the contrary, alleges that said child was conceived and born while a state of wedlock existed between said complaining witness and one, Neil Rosendahl, who is now, and at all the times in the complaint mentioned was, her husband."

The trial court overruled the demurrer and the defendant appeals.

The statute involved, § 10,500a1 of the Supplement (being § 32–3601 of the Revised Code of 1943) provides, among other things: "The parents of a child *born out of wedlock* and not legitimated owe the child necessary maintenance, education and support."

For the purposes of the demurrer the defendant admits the complainant is a married woman and that he is the father of her child, begotten and born while she was married to another. It becomes necessary therefore to determine the scope of the phrase, "a child born out of wedlock." Under the statute cited, may a child, born as stated, be said to be "born out of wedlock?"

The gist of appellant's argument is that owing to the existing marriage relations a child born to the wife during that time cannot be said to be "born out of wedlock."

Such contention unduly extends the meaning of the term "wedlock." Much of the confusion arises because of the presumption of legitimacy where the mother is married and the difficulty in obtaining proof to dispute this presumption as well as the statutory limitations as to who may raise the question. So far as the child is concerned, it is immaterial whether it is designated as illegitimate, or bastard, or born out of wedlock. In all such cases, it is illegitimate.

The extreme difficulty of rebutting this presumption and its transition from that of a practical conclusiveness to the modern trend toward a sane and reasonable ascertainment of facts is clearly set forth

in the opinion of the New York Court of Appeals—Re Findlay, 253 NY 1, 170 NE 471—written by Judge Cardozo. Therein, the court reviewed the history of the application of this presumption and in a rather exhaustive opinion traced the history of the change in the quantum of proof necessary to rebut it. Throughout the decision runs the undisputed theory the presumption never was or is conclusive.

In harmony with American jurisprudence, this state has always held that "all children born in wedlock are presumed to be legitimate" (Comp. Laws, § 4420, and Revised Code 1943 § 14–0901) as is also a child born to a married woman within ten months of the dissolution of the marriage (Comp. Laws § 4421, Revised Code 1943, § 14–0902). This is a presumption which may be rebutted, but this "presumption of legitimacy can be disputed only by the husband or wife, or the descendant of one or both of them. Illegitimacy in such case may be proved like any other fact." Comp. Laws, § 4422, Revised Code 1943, § 14–0903). The status of wedlock exists between them. The presumption is that it is their child and therefore born in wedlock. See State v. Fury, 53 ND 333, 205 NW 877, 878. But it may be shown that the child was not born to them in the status of wedlock that existed between them and is therefore illegitimate.

To protect society, this limitation on the attack of presumption is made:

"If neither the husband nor the wife to an existing marriage desires to raise any question of the legitimacy of a child born during its existence, the best interests and welfare of society will be promoted if the state likewise declines to intervene in raising that question." Re Madalina, 174 Cal 693, 164 P 348, 350, 1 ALR 1629.

In the case at bar, the legitimacy is disputed by the wife, the mother of the child. While under the common law, neither husband nor wife could bastardize a child born during wedlock, the statute removes this difficulty. As said in Vincent v. Koehler, 284 NY 260, 30 NE(2d) 587, in the absence of statute, neither husband nor wife was a competent witness in such case, whatever would be the form of the legal proceedings or whoever would be the parties. Our statute already quoted changes this, but limits this power to husband, wife, or any descendant

of either. Such was our statute when the Uniform Illegitimacy Act was adopted and the term "born out of wedlock" used.

There has never been any question but what a married woman may give birth to an illegitimate child which is therefore termed bastard. People ex rel. Hood v. Gleason, 211 Ill App 380; Stripe v. Meffert, 287 Mo 366, 229 SW 762. This applies also to cases where the parents of the child have living spouses. Lewis v. Crowell, 210 Ala 199, 97 So 691; McLoud v. State, 122 Ga 393, 50 SE 145. In Jones v. State, 11 Ga App 760, 76 SE 72, the court states:

"Both at common law, as it was interpreted in England at the time of our adopting statute, and under the statute of this state, a child of a married woman, begotten by one who is not the husband of the mother, is a bastard. While there is a strong presumption that a child born during wedlock is legitimate, this presumption is not conclusive, and will be held to have been rebutted, where the proof to the contrary is clear."

"A child born out of wedlock is an illegitimate child." Sweet v. Hamilothoris, 84 Cal App 775, 258 P 652, 655. "In common parlance 'illegitimate child,' 'natural child' and 'bastard' are interchangeable terms connoting a child born out of wedlock." This is so even if a state makes distinctions between natural children and bastards "with regard to their status and capacity to inherit." Lathan v. Edwards (CCA 5th) 121 F(2d) 183, 185. As a married woman may have an illegitimate child, the child perforce must have been born while the relation of wedlock existed between her and her husband and not between her and the father of her child.

Wedlock means the ceremony or state of marriage. It is equivalent to what we term matrimony and that is the relation which is derived from marriage. Where the man and the woman are thus married to each other so that the status of wedlock exists between them, then this matrimonial relationship is established. The law, for the protection of society, assumes that any child thus born to the wife is born in wedlock and is therefore legitimate; but because of the peculiar interests which exist between this husband and wife, or any descendant of this husband or of this wife, this presumption that the child was born in wedlock—that is, that the child is legitimate—may be overthrown.

The terms "lawful matrimony" and "unlawful matrimony" are confusing. Matrimony is defined by Webster as "the union of man and woman as husband and wife; . . . the married state; marriage; wedlock." While this exists, the state of matrimony exists. Where this status exists and the wife gives birth to an illegitimate child, it is because of an unlawful assumption of matrimonial relations. This so-called "unlawful matrimony" is a violation of the mutual rights of each and therefore that term, as used in such statute as is considered in Vincent v. Koehler, 284 NY 260, 30 NE(2d) 587, supra, is simply synonymous with "born out of wedlock."

Many courts use the term "born out of lawful wedlock." This is recognition of the fact that though husband and wife live in lawful wedlock—lawful because they are legally married to each other—yet a child may be born to her that is not the fruit of this wedlock; and therefore the child is born out of wedlock, out of lawful wedlock. There can be no wedlock that is not lawful wedlock.

The term "out of wedlock" used in the Uniform Illegitimacy Act, arises because of the presumption which attaches to children born to a man and woman married to each other. Where a man and woman are legally married, and thereafter during the existence of the marriage relation the woman has a child, the very strong presumption is that it was born in wedlock, and not born out of wedlock; that is, that it is a legitimate child, not illegitimate. The term "wedlock" refers to the status of the man and his wife, not the status of the woman and her paramour. As to the latter, there is no wedlock and the child born to them is born out of wedlock. Because it is thus born out of wedlock and is therefore illegitimate, the natural father can be required to support it. The fact that there may be difficulty in proving the child was born out of wedlock—that is, that it is the illegitimate child of the mother, the child of one to whom she is not married—has no bearing upon the issue presented to us.

At the time of Re Findlay Case, 253 NY 1, 170 NE 471, supra, the state of New York had adopted in general the Uniform Illegitimacy Act (chap. 255, Laws of 1925), differing slightly from ours, which contained a provision defining the term "a child born out of wedlock" as one that was "born out of lawful matrimony" and other conditions.

But the court made no reference to such definition in dealing with the presumption of legitimacy. The same court in Vincent v. Koehler, 284 NY 260, 30 NE(2d) 587, had occasion to deal directly with the Uniform Illegitimacy Act and this term, "born out of wedlock." Therein the court says:

"In judicial opinions, judges, according to their individual tastes or whims, had used indiscriminately the terms 'natural child' or 'child born out of wedlock' or 'bastard' to describe a child whose father was not the mother's husband; and difference in the descriptive terms was not intended to carry any juridical consequences."

The court goes on to say:

"A 'natural child' or a 'child born out of wedlock' or a 'bastard' as defined by the statutes is in effect a child born 'out of lawful matrimony' or born to a married woman under conditions where, as stated in Re Findlay, supra, the presumption of legitimacy is not conclusive and has been rebutted."

While the New York Uniform Illegitimacy Act differs slightly from ours in attempting to define the term "born out of wedlock" and in this attempt specified the child "born out of lawful matrimony" as illegitimate, yet it must be clear that the expression "lawful matrimony" has little significance. There can be no unlawful matrimony. Matrimony is the status derived from marriage. If there is such status, it is matrimony and therefore lawful, and where there is no marriage, ceremonial or common, yet the parties cohabit, then we use this phrase for want of a better description and call it "unlawful matrimony." The expression "born out of lawful matrimony" has no special significance. It is born out of a matrimonial relationship existing between its parents.

This Uniform Illegitimacy Act of New York, construed in the Vincent v. Koehler Case, supra, is chapter 255 of the 1925, Laws of New York. This law states:

". . . a child born out of wedlock is a child begotten and born: (a) out of lawful matrimony; (b) while the husband of its mother was separated from her a whole year previous to its birth; or (c) during the separation of its mother from her husband pursuant to a judgment of a competent court."

The same legislature, however (chap. 515 of the Laws of 1925) defined the terms, "bastard" and "illegitimate child," stating that such a term when used "in statute means a child born out of wedlock." It provides that the term "illegitimate child shall not be used, but the term 'child born out of wedlock' shall be used in substitution. . . ." In other words, when the Court of Appeals of New York was considering this Findlay Case in 1930 and this Vincent v. Koehler case in 1940, it had before it these two statutes, so that the two terms are considered synonymous, and therefore in any of these situations the child would be illegitimate and born out of wedlock.

In Com. v. Kerr, 150 Pa Super Ct 598, 29 A(2d) 341, the court held that where a child was born to a married woman a month after her divorce, and one other than her husband was its father, this father could be prosecuted "for wilful neglect to support a child born out of wedlock," at the same time setting forth the rules necessary to be observed to overcome the presumption of legitimacy.

The history of the proceedings dealing with illegitimate children, as traceable in the legislation of the Territory of Dakota and of the State of North Dakota, shows fluctuation in the concept of a proper remedy therefor. At the first session of the territorial legislature, a bastardy statute was enacted (Laws 1862, chap. 6) whereby the mother of an illegitimate child could have its illegitimacy established and secure support or partial support of the child from its father. This statute provided that the complaint in the case could be made by *any female*. It was not restricted to unmarried women. When the territorial laws were revised, and incorporated in the revision of 1877, the same theory was adopted, for the revised statute gave this right of complaint against the father in a case where *any woman* is delivered of a bastard child. This remained the law of the Territory and of the State of North Dakota until the revision of the code in 1895 where this (section 7839 of such revision) bastardy statute was changed, limiting its application to cases where "any *unmarried* woman" gave birth to a child. So far as the bastardy statute was concerned, this remained the law of the state until the adoption of chap. 70, Sess. Laws of 1917, dealing with "Legitimatizing Children Born Out Of Lawful Wedlock," and the Uniform Illegitimacy Act, chap. 165 of the Sess. Laws of 1923,

§§ 10500a1–10500a37 of Supp, and §§ 32–3601 to 32–3635 of the Revised Code of 1943.

When the social concept changed, the emphasis was shifted from statutes primarily for the benefit of the mother of the child so that she would be enabled to secure support or partial support from the father, to statutes primarily for the benefit of the child to establish its paternity and right of inheritance. Where the state was interested, was in preventing the child from becoming a public charge.

The adoption of the Uniform Illegitimacy Act superseded the old procedure set forth in the Compiled Laws of 1913, being §§ 10,483 to 10,500 thereof. State v. Fury, 53 ND 333, 205 NW 877, supra. Clearly the Uniform Illegitimacy Act intended to broaden and change the scope of such proceedings. No longer were these to be limited to cases where an unmarried woman gave birth to a child, but the act by its very title shows that it was to cover the case of all children born out of wedlock.

As used in our Uniform Illegitimacy Act, the term "wedlock" refers to the status of the parents of the child in relation to each other. When a child is born when the father and mother are not married and never have been married to each other, it is born out of wedlock. Thus the child of an unmarried man and an unmarried woman is a child born out of wedlock. A married woman giving birth to an illegitimate child, begotten by one other than her husband, has a child born out of wedlock, for she is not married to its father. A married man and an unmarried woman may have a child born to them and as to him it is also born out of wedlock because the parents are not married to each other.

A reasonable construction of the Uniform Illegitimacy Act shows clearly it was intended to cover all cases of illegitimate children. As the trial court points out in his memorandum opinion, the primary purpose of this Uniform Act is to establish the paternity of the child, and, this being done, to compel the father to support it or contribute to its support. This is the very purpose of the proceedings and certainly was intended to cover all cases of illegitimacy. Hence, this would cover the illegitimate child of a married woman or the illegitimate child of a married man, as well as the illegitimate child of an unmarried woman or unmarried man.

In 1807 the English courts, Rex v. Luffe, 8 East 193, 103 Eng Re-

print, 316, sustained an adjudication of bastardy brought upon the complaint of a married woman and therein the chief justice, Lord Ellenborough, says (p. 320):

"For when the question is whether this were a child born out of lawful matrimony, that is, out of the limits and rights belonging to that state, it is the same in substance as the question, whether it be a bastard. It is so for the general purposes of the Act. The matrimony does not cover the child if it be in other respects (according to the rule of law applicable to this subject) a bastard. And so it seems that a child born by adulterous intercourse is as much within the provision of the Act . . . as one which is born of a single woman."

The Act referred to gave "jurisdiction to magistrates to take examinations for making orders of affiliation in case of bastards" and it was claimed this confined cases to children of single women, but the Chief Justice showed that much earlier than this act of George II was an act of 18 Eliz. chap. 3, which gave to the magistrates jurisdiction to affiliate bastards "begotten and born out of lawful matrimony." The court shows clearly that there was a distinction between the status of such a child and the degree of proof that was required to establish such a status.

Again, the English courts in 1853—Reg. v. Pilkington, 2 El & Bl 546, 118 Eng Reprint 872, 875—had a similar case before them and therein Lord Campbell, the chief justice, shows that as a matter of fact where a married woman gave birth to an illegitimate child she would be considered a single woman "in the sense intended by a statute which provides for the maintenance of bastards. It would be strange if one class of bastards, though small, were left entirely destitute, and there were no liability in the putative father." Lord Coleridge and Lord Erle concurred in this broadening of the term "single woman." That is, they considered that in bastardy proceedings a married woman would be considered a single woman, as far as such a case was concerned. Because the child was not the issue of the marriage state, she would be divested of the cloak of wedlock. In both cases, there was no dispute about the marriage state and the evidence showed clearly the absence of the husband. These cases are indicative of the social trend reflected in legislation.

While the issue raised in this case has apparently not been before the American courts to any great extent, nevertheless it must be clear that every time the illegitimacy of a child born to a married woman is established the courts in fact find the child was born *out of wedlock* because it was born out of "lawful matrimony."

The decision of the trial court is foreshadowed in the decision of this court in State v. Fury, 53 ND 333, 205 NW 877, already cited. While the facts in this case cited are not identical with the facts in the case at bar, nevertheless we held that a woman could maintain an action under the Uniform Illegitimacy Act against the father of her child that was born to her within seven months after she was divorced. The child had been conceived two or three months prior to the divorce and therefore during the period while the woman was married. It was born six or seven months after the marriage was dissolved. It therefore would be presumed to be born in wedlock. The illegitimacy of the child rested, not upon the fact that it was born within six or seven months after the divorce was granted,—that would not make it illegitimate—but because it was conceived during the period of matrimony, and her husband was not its father.

We hold in this case cited:

"A proceeding may be brought under the Uniform Illegitimacy Act, chapter 165, Sess. Laws, 1923, on the complaint of the mother of a child born to her within ten months subsequent to the dissolution of her marriage to another than the alleged father."

The same presumption of legitimacy attached to this child as would have attached had the marriage been dissolved by death. It is true she was not a married woman when the child was born, but ordinarily under the established rule the child would be presumed to be legitimate and the limitation as to those who could attack its legitimacy, specified in § 4422 of the Comp. Laws, being § 14–0903 of the Revised Code of 1943, would still govern, the presumption being based on the previous marriage relationship. Divorce does not destroy the presumption. Boyers v. Boyers, 283 Ky 1, 140 SW(2d) 646.

Thus, a child, born to a married woman, but not begotten by her husband, is a child "born out of wedlock," within the purview of our

Uniform Illegitimacy Act. The trial court was right in so determining and so the order overruling the demurrer is affirmed.

CHRISTIANSON, Ch. J., and MORRIS, NUESSLE, and BURKE, JJ., concur.